**SO ORDERED: May 8, 2015.**



**Robyn L. Moberly**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BOONE COUNTY UTILITIES, LLC | ) | CASE NO. 03-16707-RLM-11 |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| BOONE COUNTY UTILITIES, LLC | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| vs. | ) | No. 12-50128 |
| | ) | |
| THE BRANHAM CORPORATION | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Confirmation of a debtor's chapter 11 plan is a notable event. A confirmed plan is a new contract that rearranges the debtor's financial relationship with its creditors and equity interest holders and any other entities that are bound by the plan. Once a plan is

1

"substantially consummated" [1] and the final decree entered, the bankruptcy court's involvement in the case is terminated.  After that, creditors may seek recourse in a nonbankruptcy forum under the new contract which is the plan.  They do not get a "do over" of the plan and cannot relitigate the terms of the confirmed plan after the appeal time has expired.

The debtor and plaintiff here, Boone County Utilities, LLC ("BCU") filed a liquidating plan.  Confirmation of that plan occurred over ten years ago and was indeed notable because it provided for payment in full to all creditors with a sizeable distribution left to be paid to the debtor's sole equity holder, Newland Resources, LLC  ("Newland"). Neither Newland nor anyone else paid under the plan is disgruntled.  The disgruntled party here is Newland's current judgment creditor, the Branham Corporation ("Branham"). Branham was a participant in the chapter 11 case but, as of that point in time, had not obtained a judgment or a charging order against Newland.  It was entitled to nothing from BCU under the confirmed plan because it was not a creditor of BCU. Its tenacious collection efforts *in state court* to collect its judgment against Newland challenged the distributions made under the confirmed plan and amount to asking for a "do over" of the confirmed plan.  For this, BCU reopened the bankruptcy and sought by adversary complaint both a declaratory judgment and sanctions.

### I. Background

The facts relevant to this court's limited charge are uncontested and a review of this court's docket reveals the following.  In late 1995, Newland and Branham entered into a contract whereby Branham agreed to assist Newland with negotiating contracts and obtaining certifications needed to operate a waste water and water supply utility yet to be formed (later, BCU).  In return, Newland agreed to pay Branham a "success fee" based upon the sale price ultimately paid for the utility.  BCU was formed after the Newland/ Branham contract was executed and it operated the utility that was the subject of the Newland/ Branham contract.  Newland owned 100% of BCU and at all times it has been the sole member of BCU.  BCU eventually sold the utility, the proceeds upon which Branham's success fee was based.  Neither Newland nor

---

[1] See 11 U.S.C. §1101(2)

Branham could have predicted in 1995 that litigation to collect Branham's success fee under the Newland / Branham contract would still be raging twenty years later. This decision will likely not end that litigation.

BCU was, and is, a private entity and the utility company it owned and operated was regulated by the Indiana Utility Regulatory Commission ("IURC"). In late 2001, the Board of Commissioners of Boone County ("Commissioners") petitioned the IURC to revoke BCU's certificates of territorial authority. On March 12, 2003, the IURC issued a scathing interim order (ECF No. 147-9 , ECF No. 147-10 and ECF No. 147-11)  critical of BCU's billing practices, management, and Newland's capitalization of BCU ( the "First IURC Interim Order"). The First IURC Interim Order concluded that BCU "employed sloppy and manipulative accounting practices" and that it "abused its monopoly powers in order to unjustly enrich its ultimate owners in their non regulated ventures".  It also found that Newland failed to invest in BCU the cash it said it would in order to obtain IURC authorization to operate. In the First IURC Interim Order, the IURC directed BCU's investors (Newland) to pay to BCU a total cash equity infusion of $1,790,616 within 60 days.  The IURC continued its investigation and set a compliance hearing to be held within 90 days. Few, if any, of the directives contained in the First IURC Interim Order were fulfilled within the 90-day period.

BCU filed its chapter 11 case on September 8, 2003 to get a breathing spell and to find a buyer for the utility.  A creditors' committee was formed and retained counsel. When the IURC scheduled the compliance hearing post petition, BCU moved for a temporary restraining order (Adversary Proceeding 03-584), which this court denied. The IURC conducted the compliance hearing and on December 17, 2003, issued its Second Interim Order (the "Second IURC Interim Order") (ECF No. 147-12) which found BCU to be in substantial non compliance with the First IURC Interim Order.  However the Second IURC Interim Order went beyond mere rate making and monitoring of BCU's regulatory compliance; it ventured into bankruptcy territory by setting a hearing either to consider the appointment of a receiver to operate the utility or to entertain satisfactory offers to acquire it.  The jurisdictional dust-ups that occurred between this court and the IURC and related parties resulting from and after the Second IURC Interim Order will be discussed later.  Suffice to say that the IURC eventually

acknowledged this court's exclusive jurisdiction over BCU's assets and made no further attempts to value or market the utility's assets and ceased its enforcement efforts.

After much activity in the chapter 11 case, the details of which are discussed *infra*, BCU's chapter 11 plan was confirmed on September 14, 2004 ("Confirmation Date''). Newland did not pay Branham its success fee and, shortly after the Confirmation Date, Branham sued to collect its success fee in the Boone County Superior Court (the "State Court") (denominated the "517 case" for the last three digits of the state court case number). On November 2, 2007 – nearly three years after the confirmation of BCU's plan -- Branham finally obtained a judgment against Newland for $397,853.92 (the "Judgment") in the 517 Case. This Court makes no finding with respect to the State Court activity, except to note that BCU does not dispute Branham holds a judgment against Newland.

By way of context, but not as a finding, the court notes that in early 2012, at least 7 years after confirmation of BCU's plan and 4 years after it obtained its Judgment, Branham filed a new complaint (ECF No. 41-21) in the State Court against several defendants, including Newland, its members, BCU's bankruptcy attorney, Newland's bankruptcy attorney and those attorneys' respective law firms (denominated the "001 Case" for the last three digits of the state court case number). BCU was not named as a defendant. Branham in the 001 Case alleged in part that the First IURC Interim Order was "notice to the world that BCU was to cease any payment, distribution, advancement and/or any other transfer of BCU property to Newland after March 12, 2003 unless made in compliance with Ind. Code §8-1-2-49" (ECF No. 41-21, ¶208, page 29 of 38). It further alleged that distributions made under BCU's confirmed plan were illegal and that the defendants receiving those distributions (including the professional fees paid to BCU's bankruptcy attorney and fees paid to Newland's and its counsel) committed the predicate offenses of fraud, deception, conversion, theft and/or receiving stolen property under the Indiana Crime Victims Relief Act (Ind. Code §34-24-3). (ECF No. 41-21, p.18-35).

Branham also filed a proceedings supplemental motion in the 517 Case (the "517 Motion") in late December, 2011 (ECF No. 41-22), in aid of collection of its Judgment and named BCU as a garnishee defendant, along with Newland's members, attorneys,

4

BCU's bankruptcy attorney and his law firm.  The 517 Motion went far beyond simply asking for garnishment of funds the garnishee defendant might have owed Newland.  It was a 71-page motion that alleged many of the same bad acts alleged in the 001 Case. It further alleged that the First IURC Interim Order prohibited BCU from paying contribution fees [2] and distributions to Newland and thus, the plan payments were illegal, void *ab initio* and still property of BCU.  Both the 001 Case in which BCU was not a party and the 517 Motion in which BCU was a garnishee defendant alleged illegalities with respect to distribution under BCU's confirmed plan.  BCU moved to reopen its chapter 11 case and filed in this court a complaint for declaratory relief which named both Branham and its attorneys, Stewart and Irwin, as defendants.

Meanwhile, BCU's bankruptcy attorney and other garnishee defendants in the State Court responded to the 517 Motion and moved to either quash or dismiss it. Branham, in response, sought clarification from the State Court  "whether it is permissible to proceed against these garnishee Defendants in light of the pending BCU Complaint…".  (ECF No.41-23, p. 4 of 6).  Branham continued to argue in that clarification motion that "Branham's position is that the confirmed Plan is a contract to be interpreted and enforced under Indiana law and does not preempt the application of Indiana law to transfers from BCU to Newland".  (ECF No. 41-23, p. 3 of 6).

In this court, Stewart and Irwin moved to dismiss BCU's complaint as to them for lack of subject matter jurisdiction and failure to state a claim.  A lengthy hearing was held on that motion to dismiss in which the parties discussed the limits of this court's jurisdiction.  The October 4, 2012 order (ECF No. 39) dismissing Stewart and Irwin from the lawsuit also provided that this court would decide and interpret all pertinent orders entered in the chapter 11 case from the Petition Date, including orders related to distributions and transfers made by BCU and the IURC's involvement in the chapter 11 case:

> The parties stipulated during the hearing that the U.S. Bankruptcy Court has concurrent and ancillary jurisdiction to construe and enforce its orders. This court has determined it shall exercise its jurisdiction to interpret and enforce all of its orders and rulings with respect to the Boone County Utilities, LLC Chapter 11

---

[2] The First IURC Interim Order defined "contribution fees" as "one-time charges assessed new customers to finance development of utility systems necessary to serve those new customers" (ECF No. 147-9, page 8 of 21).

Bankruptcy Case from the petition date of September 8, 2003 up to and including all distributions and transfers made by Boone County Utilities, LLC to Newland Resources, LLC and all matters respecting the Indiana Utility Regulatory Commission's involvement in the BCU bankruptcy, to enter such further orders as is necessary to rule upon, and, if appropriate, grant the relief requested in this adversary proceeding.

With this clarification from the bankruptcy court, Branham withdrew the 517 Motion in the State Court as to BCU's attorneys and Newland's attorney. (ECF No. 41-24). In its order granting the withdrawal, the State Court recognized that the 517 Motion was not a garden variety garnishment action. It found that it was a new, and not supplementary, action because it requested affirmative relief against parties that went far beyond inquiring about assets owed to Newland. (ECF No. 41-28). Branham also moved to dismiss BCU's and Newland's attorneys as defendants in the 001 Case. (ECF No. 41-25). The State Court dismissed BCU's attorneys from the 001 Case on February 4, 2013 since their involvement with BCU was primarily during the pendency of the chapter 11 case and since it would be the bankruptcy court that would interpret and enforce orders entered during that period. (ECF No. 41-27).

Branham's state court litigation against BCU, Newland, their attorneys and a host of other related defendants rises and falls on Branham's contention that the distributions by BCU under its confirmed plan were void and of no effect because they were made in violation of applicable IURC regulatory law and Indiana corporate law which was not preempted by the confirmed plan. On April 1, 2014, this Court entered partial summary judgment in favor of BCU on Branham's counterclaim. On September 17, 2014, this Court granted BCU's motion to quash subpoena and issued its protective order regarding discovery that Branham propounded to BCU. Both the April 1, 2014 [3] (ECF

---

[3] The Court's April 1, 2014 order granted partial summary judgment in BCU's favor on Branham's counterclaim. Branham filed a counterclaim to conduct discovery and for an order of garnishment. BCU moved to dismiss that counterclaim. Because the motion to dismiss and Branham's response thereto presented matters outside the pleadings, this Court treated the motion to dismiss as a motion for summary judgment under Fed.R. Civ. P. 56 but gave no formal notice that it was doing so. The purpose of the notice is to give the non moving party the protections of the longer deadlines contained in Fed. R. Bankr. P. 7056. Branham argues in its brief in support of its motion for summary judgment here that "[t]he Court, sua sponte and without notice, treated the motion to dismiss as a summary judgment motion…" (ECF No. 149, p. 2 of 18). Fed. R. Civ. P. 12 (d) only requires that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion". Branham was given a reasonable opportunity to present its material, well in excess of the responsive pleading time provided for

No. 116) and September 17, 2014 (ECF No. 145) Orders discuss to some degree various orders upon which BCU seeks declaratory judgment. This order incorporates the findings in those orders.

As its October 4, 2012 order provided, this Court will not adjudicate any controversies that arose from facts occurring after Newland received plan distributions. In their cross motions for summary judgment, both BCU and Braham request relief that far exceeds the boundaries of this Court's charge. The papers filed by both sides are voluminous, and in them, the parties attempt to lead the Court down a lot of rabbit holes. Given the limited scope of its task, the Court declines the invitation. As a result, this decision will likely not end – but merely streamline, clarify, and move to another forum -- the BCU/ Branham litigation.

### Summary Judgment

Count I of BCU's complaint seeks a declaratory judgment which requires this court only to interpret its orders entered in the chapter 11 case. Both parties have moved for summary judgment on Count I. This procedural posture asks for summary judgment on a declaratory judgment. Interpretation of court orders and issuance of a declaratory judgment based on that interpretation requires no evidence, no witnesses and no testimony, and by its very nature, presents no genuine issue of material fact. Thus, the matters in Count I upon which this court does not render a declaratory judgment , via summary judgment, will not be later "tried" because the relief sought – this court's interpretation of its orders – has been accomplished. The parties will resume their state court litigation with the benefit of this court's interpretation of bankruptcy court orders that relate to that litigation.

---

under Fed. R. Bankr. P.7056. The motion to dismiss was filed on December 9, 2013 (ECF No. 81). That motion presented matters outside the pleadings. Branham 's objection to that motion, complete with case authority, was filed on December 23, 2013 (ECF No. 87). Thomas Eckerle was given permission to intervene in this case and file his *amicus* brief in support of the motion to dismiss on January 3, 2014 (ECF No. 92). Branham filed a response to that *amicus* brief on January 10, 2014 (ECF No. 96). Hearing on the motion to dismiss was held on February 20, 2014, more than two months after the motion to dismiss was filed. Branham had a reasonable opportunity to present all pertinent materials. Branham has continued to press its same issues and arguments before this court and has not been limited in doing so.

In the first paragraph of its motion for summary judgment, BCU does not seek summary judgment on its request for sanctions in Count II (ECF No. 125, p. 1).  Its prayer for relief asks for a finding that Branham willfully and intentionally violated orders of this court.  The Court understands this to mean that BCU moves for partial summary judgment on Count II as to sanction liability, with a damages hearing to be held later. (ECF No. 125, p. 9 of 10).

Branham seeks summary judgment on both Counts I and II.  Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the "movant is entitled to judgment as a matter of law" under Fed. R. Civ. P. 56, applicable here under Fed. R. Bankr. P. 7056.  Summary judgment is appropriate when, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When a movant's motion is adequate to support the basis of movant's claims, it is the non-movant's burden to demonstrate a genuine issue of fact for trial. *Crawford v.Countrywide Home Loans, Inc.* 647 F.3d 642, 647 (7th Cir. 2011). The non-moving party must point to specific evidence, that would be admissible at trial, which "could support judgment in [non-movant's] favor" in order to avoid entry of summary judgment against non-movant. *Marr v. Bank of Am., N.A.* 662 F.3d 963, 966 (7th Cir. 2011).

Branham asserts that BCU's motion for summary judgment on Count I should be denied because the motion does not sufficiently identify the claims upon which BCU seeks summary judgment and BCU does not adequately designate the matters upon which there is no genuine issue of material fact (ECF No. 146, p.6).   The Court finds that BCU's summary judgment motion and accompanying materials substantially comply with the requirements of Fed. R. Bankr. P. 7056 and applicable local rules.

### *Declaratory Relief*

BCU seeks a declaratory judgment with respect to certain orders entered in the chapter 11 case.  Branham asserts that declaratory relief here is inappropriate.  The Federal Declaratory Judgment Act states:

8

> "In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

28 U.S.C. Section 2201(a)

This was codified by Indiana under the Uniform Declaratory Judgment Act located at I.C. 34-14-1-1 which states as follows:

> Courts of record within their respective jurisdictions have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect. The declaration has the force and effect of a final judgment or decree.

Bankruptcy law is federal law; it preempts state law pursuant to the supremacy clause. *Hammes v. Brumley*, 659 N.E. 2d 1021, 1027 (Ind. 1995). *reh'g denied.* 28 U.S.C. §1334(a) provides that federal courts have original and exclusive jurisdiction in all bankruptcy matters. The Indiana Supreme Court has noted "there should be no legitimate question about the legislative intent to vest the [federal court] with a complete pervasive jurisdiction over all matters that have to do with a bankruptcy case." *Hammes* at 1027.

In *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 Led. 826 (1941), the Supreme Court stated, "Basically the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Quoted in MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 S.Ct. 764 U.S. (2007).

There is a substantial controversy here between the parties because the outcome of certain state court litigation hinges on this court's interpretation of orders entered in BCU's chapter 11 case. There can be no dispute that this Court has jurisdiction and is the best suited to interpret its orders. Branham argues that

9

declaratory relief here is inappropriate and that it runs the risk of gratuitously interfering with the State Court proceedings. (ECF No. 146, p. 33). The court finds no such risk exists.

## II. Declaratory Relief Sought by BCU

BCU asks this Court for declaratory relief with respect to several matters which can be broadly categorized as follows: (1) the bankruptcy court's exclusive jurisdiction over BCU's assets, utility sale proceeds, distributions under its confirmed plan; (2) the finality and appealability of orders entered in the BCU case, including orders disallowing Branham's claims; and (3) the post-filing effect on BCU of the First IURC Interim Order, the jurisdiction of the IURC, and whether the plan preempted otherwise applicable nonbankruptcy law pertaining to plan distributions.

### A.    The Bankruptcy Court had exclusive jurisdiction over BCU's assets, sale proceeds and distributions made under the confirmed plan

BCU filed its chapter 11 case to sell the utility. The IURC's statutory authority to appoint a receiver and to entertain bids for the purchase of the utility directly conflicted with that purpose. After the Petition Date, BCU on several occasions asked for this court to enforce the automatic stay against the IURC or related entities to prevent the IURC from asserting jurisdiction and assuming control over BCU's assets. The jurisdictional "dust ups" between BCU, the IURC, the Boone County Commissioners, ("Commissioners") and the Indiana Office of the Utility Consumer Counselor (OUCC) collectively resulted in orders from this court which clearly mandated this court's exclusive jurisdiction over BCU's assets.

Shortly after the Petition Date, BCU moved to enjoin the IURC from conducting further hearings related to BCU. This court denied that relief, leaving the IURC free to hold its compliance hearing. As a result, the IURC issued its Second IURC Interim Order which ordered that a hearing be held to consider the appointment of a receiver to operate the utility or a sale of the utility. After the issuance of the Second IURC Interim Order, BCU asked this court to clarify the scope of its jurisdiction over BCU's assets. The Court did so in its January 30, 2004 order, finding that "28 U.S.C. §1334 (e) grants

10

to the United States District Court for the Southern District of Indiana, and through its order of reference, to this Bankruptcy Court, exclusive jurisdiction over this Debtor's assets". (main case no. 03-16707, ECF No. 107).  When the Boone County Commissioners sued Whitestown and certain Whitestown officials in the State Court to enjoin the pending sale of the utility to Whitestown, this court again clarified its jurisdiction in its order enforcing the automatic stay and reiterated that the sale agreement and related novation agreement were property of the bankruptcy estate and that this court had exclusive jurisdiction over such property (main case no. 03-16707, ECF No. 172, p. 5). This Court's order approving the sale to Whitestown provided that it retained jurisdiction over the assets for the purpose of enforcing the provisions of the sale order and to resolve disputes arising from the purchase agreement (main case no. 03-16707, ECF No. 167).  The IURC itself conceded that this court had exclusive jurisdiction in its February 25, 2004 order (the "IURC Stand Down Order", ECF No. 41-1) wherein it recited:

　　　　We note that the United States Bankruptcy Court has scheduled a hearing on the sale of BCU assets for March 22, 2004.  The Commission recognizes that the United States Bankruptcy Court has the full power and exclusive jurisdiction to conduct the sale of assets of Boone County Utilities, a debtor in possession under the Bankruptcy Code. Therefore, the Presiding Officers hereby stay all proceedings before the Commission under Cause No. 42131.  IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that: 1.  Based on the information above, the Presiding Officers hereby stay all proceedings before the Indiana Utility Regulatory Commission under Cause No. 42131".

After the sale to Whitestown was approved but before it closed, the OUCC requested a status conference *in the IURC proceeding* and asked for expedited review of the pending sale.  BCU again was forced to seek enforcement of the automatic stay in this court.  The IURC denied the OUCC's request (ECF No. 41-4) citing the IURC Stand Down Order, allowing BCU to withdraw its motion to enforce the stay filed in this court. BCU filed no fewer than two adversary proceedings (Adv. Proc. 03-584 and 04-149) seeking injunctive relief against the IURC and/or its commissioners with respect to BCU's assets.  Both of those adversary proceedings resulted in agreed stipulations of dismissal.  BCU's confirmed plan defined "*Property*" as "any interest or Claim of the Debtor in any kind of property or asset, whether real, personal, tangible, intangible or

mixed". (main case no. 03-16707, ECF No. 123, ¶1.24, p. 4 of 158). The plan also provided that the bankruptcy court retained jurisdiction "to determine all questions and disputes regarding title to the *Property* of the estate…" (main case no. 03-16707, ECF No. 123, ¶10.4, p. 17 of 158). This Court had exclusive jurisdiction over BCU's assets, sale proceeds and distributions made under the confirmed plan.

### B. Finality of Orders Entered in the BCU chapter 11 case

### 1.    The Sale Order

BCU's assets consisted of the utility and its related property. BCU moved to sell its assets to the Town of Whitestown ("Whitestown") for $4,200,000 in March, 2004. The Boone County Commissioners objected to the sale (main case no. 03-16707, ECF No. 158) and submitted a competing bid from the City of Indianapolis, Department of Waterworks (the "City"). The Commissioners objected to the proposed "break up" fee to be paid to Whitestown in the event its bid was not accepted. The Commissioners argued that the sale was contrary to law because BCU's plan was contingent upon approval of the sale and the plan provided for preemption of nonbankruptcy law regarding the approval and authorization of a transfer of public utility property and issuance of operating permits. The gist of the objection was that BCU was required under state utility law to seek the IURC's approval of the sale of utility assets and the approval of Whitestown as the new operator. Finally, the Commissioners objected because Whitestown failed to comply with Indiana's Open Door Law when it negotiated the purchase agreement and related novation agreement. The sale motion drew two other objections, one of which was the competing bidder, the City. The City, along with the other objector, withdrew its objection at the hearing on the sale motion and thus the only pending objection was that of the Commissioners. The court's order of March 25, 2004 (main case no. 03-16707, ECF No. 167) authorized BCU "to sell all of its rights, title and interest in and to the property and assets to Whitestown" and that "the proceeds of the sale of the assets, after payment of all expenses of the sale, shall be distributed pursuant to the Debtor's Amended Liquidating Plan of Reorganization, or upon further Order of this Court". Another paragraph of the sale order provided that

12

BCU "shall retain the proceeds of sale in a segregated interest bearing account maintained by attorneys for the Debtor and such sale proceeds shall be distributed only as expressly authorized by subsequent orders of this Court". The Commissioners' objections were expressly overruled by the order approving the sale which provided that "Each…agency… is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement" (main case no. 03-16707, ECF No. 167, ¶ j., p. 8 of 146) and that "Whitestown was properly authorized, by taking final action at public meeting, subsequently ratified through further public meetings and ordinances, to enter into the Purchase Agreement and the Novation Agreement.." (main case no. 03-16707, ECF No. 167, ¶ 7, p. 4 of 146).   The sale order was docketed on March 25, 2004 and was not appealed.  It became a final and non- appealable order on April 6, 2004 when no notice of appeal was filed by April 5, 2004. [4]

## 2.   The Confirmation Order

BCU's chapter 11 plan provided for distribution of the sale proceeds.  The plan classified claims and interests into 6 classes.  Newland was Class 6 and at the bottom rung of payment priority, being the holder of an equity interest.  Classes 1 and 5 were to receive distribution under the plan, along with the professionals employed in the case and certain administrative and priority tax claims.  Classes 2, 3 and 4 consisted of creditors whose claims were to be assumed by Whitestown.   The plan provided that professionals, administrative and priority claimants and Class 1 and 5 claimants would not be paid until the "effective date" of the plan, defined as "the first business day following the day on which the Confirmation Order becomes a Final Order, without any party in interest having appealed from same".  Newland was not to be paid until professionals, administrative and priority claimants, and Class 1 and 5 claimants classes were paid in full.  The plan also provided that applicable nonbankruptcy law was preempted under §1123(a) of the bankruptcy code (discussed infra), and provided that:

---

[4] During the pendency of the BCU chapter 11 case and prior to the 2009 amendments to the Federal Rules of Bankruptcy Procedure, parties had ten (10) days from the date the order or judgment was docketed in which to file a timely notice of appeal.

[w]here the transfer or reissuance of certificates, permits and licenses issued by state agencies and political subdivisions and federal agencies is ministerial or governed by objective criteria that make it unlikely that the agencies could act or fail to act in a way that would interfere with [c]onsummation of the [p]lan, the Debtor and Whitestown intend to follow the established procedures for the transfer or reissuance of such certificates, permits and licenses if needed.  For those certificates, permits or licenses for which otherwise applicable nonbankruptcy law precludes transfer or gives state or local officials discretion to deny the transfer or reissuance, the Debtor will rely on the protections of §1123(a) and 1142(a) of the Code and the continuing jurisdiction of the Bankruptcy Court to ensure that the Debtor's Plan is implemented and that Whitestown obtains the permits and licenses it needs to operate lawfully.

The Commissioners, in their combined objection to the sale and BCU's disclosure statement, also objected to the plan on the basis that the plan could not preempt the applicable IURC law that required the IURC to approve the sale and that Whitestown was not exempted from obtaining the necessary permits and licenses (main case no. 03-16707, ECF No. 154).  According to the case docket, Branham filed an objection to the plan, but the actual document filed was the appearance of Annette Brogden on behalf of Branham, and not an objection (main case no. 03-16707, ECF No. 233).  Branham conditionally objected to the plan because it was not included as a creditor in the general unsecured class and hence would not be included in distribution under the plan.  (ECF No. 41-7, p. 8-9 of 48).  The only other objection to the plan was filed by the City (main case no. 03-16707, ECF No. 231) which was withdrawn at the confirmation hearing.

The order confirming the plan (main case no. 03-16707 ECF No. 243) confirmed BCU's amended liquidating plan in all respects, and found that Branham's conditional objection had been overruled.  It also implicitly overruled the Commissioners' objection. It provided that "the Plan does not contravene the requirements of §§1129(a)(1) and (2) as the Plan has complied with all applicable provisions of Title 11".  It also provided that "Section 1129(a)(6) [5] is inapplicable to the Debtor" and that the provisions of the plan shall bind the debtor, any entity acquiring estate property under the terms of the plan and all creditors of and claimants against the debtor.  That order was docketed on

---

[5] That section provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval".  The plan was a liquidating plan and not a reorganization plan and therefore did not provide for any rate change.

September 16, 2004 and was not appealed.  It became a final and non-appealable order on September 28, 2004 when no notice of appeal was filed by September 27, 2004.

### 3.  The Order Disallowing Branham's Claims

Branham filed a total of four claims during the BCU chapter 11 case, with each succeeding claim exceeding the amount of its predecessor.  The first three were based on the success fee under the Newland/ Branham contract.  The first claim was an unsecured claim for $136,000 (Claim #6)  filed on May 11, 2004; the second, an unsecured claim in no dollar amount (Claim #9) was filed on September 9, 2004 and amended Claim #6; the third, an unsecured claim for $648,200.35 (Claim #12) was filed on September 10, 2004 and amended Claim #9; and fourth, an unsecured claim for $7,007,954 (Claim #16) filed on May 17, 2005 which purportedly amended Claim #12. This fourth claim was based on allegations of breach of contract, constructive contract, and alleged tortious conduct as set out in the proposed complaint attached as an exhibit to Branham's relief from stay motion (main case no. 03-16707, ECF No. 239).  The proposed complaint also asked for the appointment of a receiver and was the early forerunner to what became the complaint filed in the 001 Case in State Court.  The Court had denied the relief from stay motion nearly seven months before Branham filed Claim #16.  (main case no. 03-16707, ECF No. 262).  Branham's claims, #6, #9 and #12 were denied because BCU was not a party to the Newland / Branham contract upon which those claims were based and Branham was not a creditor in this bankruptcy.  Claim #16 was denied because it was untimely and did not relate back to a timely filed claim as it was based on different theories of recovery.  Branham's relief from stay motion was timely filed (September 14, 2004) but the proposed complaint attached as an exhibit was not deemed an informal proof of claim.  The court disallowed claims #6, #9, #12 and #16 and found that the proposed complaint was not an informal proof of claim on May 20, 2005 (main case no. 03-16707, ECF No. 380).  That order was affirmed by the District Court (ECF No. 41-17) and the Seventh Circuit Court of

Appeals (ECF No. 41-19).  Branham took no further action to seek review of that order and it is final and non- appealable.

### 4.   The Order Allowing Newland's Equity Interest

Newland filed a proof of interest (although denominated "proof of claim" on the court's claims docket) on May 26, 2004 in the amount of $4,111,000.  After the plan was confirmed, BCU filed its First Amended Application to Allow and Disallow Claims (main case no. 03-16707 ECF No. 252) which addressed each claim that had been filed on or before September 9, 2004.   Paragraph 7 of the application provided that "[t]he Debtor shall allow Claim No. 8 of Newland Resources, LLC as the sole Equity Interest Holder in the amount of $4,111,000."  Branham objected to the Amended Application, but only to the extent it recommended disallowance of Branham's claims (main case no. 03-16707, ECF No. 277).  Branham made no objection as to the allowance of Newland's equity interest.  The Order on the amended application provided that "Claim No. 8 of Newland Resources, LLC in the amount of $4,111,000 is hereby allowed."  (main case no. 03-16707, ECF No. 295).  That order was docketed on January 4, 2005 and became a final and non- appealable order on January 18, 2005 when no notice of appeal was filed by January 17, 2005.

### C.  Continued Viability of the First IURC Interim Order, IURC Jurisdiction and Preemption of Nonbankruptcy Law Under the Plan

Branham continues to argue, as it did in the 001 Case and the 517 Motion in State Court, that IURC law governed distributions under the plan and that those distributions were void because they were in violation of the First IURC Interim Order.  Such a theory presupposes that the First IURC Interim Order remained viable after BCU sold its assets.  It did not.

The IURC regulates public utilities to protect the public's interest.  *Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Company*, 796 N.E. 2d 1264, 1268 (Ind. Ct. App. 2003) (IURC has "watchdog role" that requires it to protect the public interest).  Specifically, the IURC's mission is to "insure that public utilities provide constant, reliable, and efficient service to Indiana citizens and to "protect the

16

public from excessive charges." *Indiana  Payphone Ass'n, Inc. v. Indiana Bell Telephone Co, Inc.*, 690 N.E.2d 1195, 1197 (Ind. Ct. App. 1997).    Within the IURC's rate making authority is the function to "establish a rate sufficient to meet the operating expenses of the company plus a fair return which will compensate the investors." *South Haven Waterworks v. Utility Consumer Counselor*, 621 N.E.2d 653, 654 (Ind. Ct. App. 1993); *Citizens Energy Coalition, v. Ind. and Mich. Elec.*, 396 N.E.2d 441, 445 (Ind. Ct. App. 1979).  A "fair rate of return" includes consideration of the utility's capital structure. *Gary-Hobart Water Corp. v. Indiana Utility Regulatory Commission*, 591 N.E. 2d 649, 653 (Ind. Ct. App. 1992).   Inquiry into a utility's capital structure is appropriate to ensure that contribution of working capital falls on the shoulders of the investors, not consumers.  *Citizens Energy Coalition*, 396 N.E. 2d at 445.  Also within the IURC's mission is to review the utility's financial and managerial capacity.  Ind Code §8-1-30-3(a)(1).  Here, the IURC found substantial deficiencies with respect to BCU's capital structure and management and issued its First Interim Order to cure those deficiencies.  BCU's failure to cure those deficiencies subjected it to the risk that the IURC would revoke its certificate of territorial authority under Ind. Code §8-1-2-89(k), order the sale of the utility Ind. Code §8-1-30-5(b)(1) or appoint a receiver to operate the utility under Ind. Code §8-1-30-5(b)(2).  BCU filed its chapter 11 case before any of those steps were taken.

BCU's management and capital structure and Newland's ownership of BCU precipitated the issuance of the First IURC Interim Order.  BCU's operation and Newland's ownership of BCU terminated when the sale to Whitestown closed on July 20, 2004.  BCU no longer operated a utility, the actors who allegedly caused the deficiencies were no longer involved, and the deficiencies addressed in the First IURC Interim Order became moot.  The IURC recognized that the sale of BCU was in the public interest and committed to perform an expedited regulatory review of the prospective purchaser on April 22, 2004 (main case no. 03-16707, ECF No. 184).  After the sale, the IURC's regulation of the utility's management and capitalization, to the extent applicable, was shifted to Whitestown, the new operator of the utility. [6]

---

[6] The court notes that both BCU and Whitestown asserted in the chapter 11 case that Whitestown was not subject to the IURC's jurisdiction because IURC regulated only "public" utilities and municipally owned

The First IURC Interim Order was issued under consolidated cases 42131 and 42093.  Schedule 5.4(ix) attached to the sale order (main case no. 03-16707, ECF No. 167, p. 133 of 146)  entitled "Governmental Decrees or Orders to Which BCU is Subject" included the IURC First and Second Interim Orders and "any other orders issued in Cause No. 42131."  The IURC's Stand Down order of February 25, 2004 acknowledged the bankruptcy court's exclusive jurisdiction to sell BCU's assets and ordered that "the Presiding Officers hereby stay all proceedings before the Indiana Utility Regulatory Commission under Cause No 42131" (ECF No. 41-1).  Branham makes the novel but unconvincing argument that (1) the First and Second IURC Interim Orders were on appeal and were not stayed because they were not "proceedings" that were "before" the IURC (contending a matter on appeal is not "before" the IURC) when the Stand Down order was issued, and (2) the IURC maintains jurisdiction over BCU so long as BCU holds indeterminate permits that have not been terminated.  (Branham brief, ECF No. 146, pp.88-99).  As to (1), this court reiterates its finding in its April 1, 2014 order that:

> By the IURC's "stand down" order of February, 2004, the IURC stayed all proceedings in the case from which the March, 2003 and December, 2003 orders arose.  That stay was never vacated.  Any authority the IURC had over Debtor ended when the Debtor ceased operating as a public utility… after the sale to Whitestown.

As to (2), any authority the IURC maintained over BCU after the sale did not relate to the operation of the utility because BCU was not operating the utility.  Branham argues that "IURC's jurisdiction over BCU is based on the indeterminate permits…that BCU applied for, and the IURC issued to BCU…" and that "BCU was and will be subject to IURC jurisdiction until the [I]ndeterminate [P]ermits have been terminated by the IURC" (ECF No. 146, p. 93-94).  At most, BCU and/or the IURC might be required to perform administrative or ministerial tasks to formally terminate the indeterminate permits, but nothing more remains to be done regarding the actual operation or management of the utility, both of which were the subject of the First IURC Interim Order.  It is noteworthy that the last activity noted on IURC case docket 42131 was a filing made by BCU post

---

utilities were specifically excepted from that definition.   See, *Town of Merrillville v. Lincoln Utilities, Inc.*, 355 N.E. 2d 851 (Ind. Ct. App. 1976).

petition on July 12, 2004.  The IURC neither filed a pleading nor significantly participated in the chapter 11 case after April 2004.   The IURC had issued its "stand down" order acknowledging this court's jurisdiction over BCU's assets.  The First IURC Interim Order was directed at BCU's deficiencies in operating a utility.  The First IURC Interim Order became moot because BCU was no longer operating the utility after July 20, 2004.   Neither the First nor Second IURC interim order were viable against BCU's operation of the utility after that date.

In addition to asserting the continued viability of IURC orders over BCU operations, Branham also argues that applicable limited liability law governing distributions by an LLC to its members was not preempted by the plan.  Paragraph 6.2 of the Plan provided:

6.2 **Preemption**. Section 1123(a) of the Code preempts any otherwise applicable non-bankruptcy law that may be contrary to its provisions.  Accordingly, a plan may contain certain provisions that would not normally be permitted under non-bankruptcy law.  For example, section 1123(a)(5) of the Bankruptcy Code authorizes, among other things, the sale or transfer of assets by the Debtor without the consent of the State or the Indiana Utility Regulatory Commission (the "IURC").

Section 1123(a) of the Bankruptcy Code preempts state regulation from interfering with the implementation and consummation of the Plan.  Accordingly, the Confirmation Order approving the Plan and an Order of the Bankruptcy Court authorizing the sale of the Debtor's Property pursuant to the Plan will preempt "otherwise applicable nonbankruptcy law" in the following areas: (1) any approval or authorization of the IURC or compliance with IURC rules, regulations or decisions otherwise required to transfer public utility property and (2) the exercise of discretion by any other state or local agency or subdivision to deny the transfer or assignment of any of the Debtor's property, including existing permits or licenses, or the issuance of identical permits and licenses on the same terms and conditions as the Debtor's existing certificates, permits and licenses to Whitestown where Whitestown requires such permit for its post-Effective Date operations.  Such preemption pursuant to Section 1123(a) of the Bankruptcy Code shall occur at the time on the Confirmation Date or the date of the Order approving the Sale to Whitestown.  *The Confirmation Order will supersede any law, regulation or rule that might otherwise apply to the sale of Debtor's assets and the implementation of the Plan.* (emphasis added)

Under Indiana law governing limited liability companies, (Ind Code §23-18-1-1, et seq.), distributions by a limited liability company to its members and redemptions of a member's interest in the limited liability company are allowed only under specific

conditions and the distribution to Newland under the plan did not fulfill those conditions. Distributions made in contravention of the statute, Branham argues, are *ultra vires* transfers and void as a matter of law and can be recovered by BCU.  (Branham brief, ECF No. 146, p. 40 of 143).

The plan expressly preempted any applicable nonbankruptcy law that interfered with the implementation of the plan.  The only way the plan could be implemented was by distribution of the proceeds from the sale.  Implementation of the plan would have been significantly impeded if the distributions to be made under the plan were subject to the provisions of either the First IURC Interim Order or applicable LLC law.   There is no dispute that this court had exclusive jurisdiction over BCU's distributions.  Neither the IURC nor applicable LLC law applied to the distributions under the plan because of this court's exclusive jurisdiction over distributions and the preemption of applicable nonbankruptcy law under the plan that otherwise impeded the plan's implementation.

### III.  Issues Raised in Branham's Motion for Summary Judgment

### A.  Contempt

The sale proceeds distributed under the plan were sufficient to pay all professionals employed by the estate and creditors in full with enough left over to pay a sizeable amount towards Newland's allowed $4,111,000 equity interest.  Newland received two distributions, the first of which occurred on the Confirmation Date or the day after and was for $2,500,000.  The second installment was made in May, 2005 and Newland received approximately $3,000,000 in total under the confirmed plan.

Branham in its motion for summary judgment argues that BCU, Newland, and Newland's members should be held in contempt because (1) they did not wait until the expiration of the ten day (now 14) period under Fed. R. Bankr. P. 3020(e ) which provided that an order confirming a plan is stayed until the expiration of (then) 10 days after the entry of the order, unless the court orders otherwise, and (2) distribution to Newland violated Section 4.6 of the plan which provided that Newland not be paid until claimants in Classes 1 and 5 were paid in full, and distribution to Classes 1 and 5 was not to have occurred until the "effective date", and Section 6.1 which required further

20

court order to distribute the sale proceeds.  The Court has adequately addressed the
Rule 3020( e) argument in its September 17, 2014 Order ( ECF No. 145):

> …to hold Newland "in contempt" for [failing to wait the 10 day period] …is
> baseless.  One is held in contempt only for violation of a court order and nothing in the
> confirmation order provided for BCU to wait ten days to distribute funds, either.  Second,
> any procedural misstep was harmless because BCU retained more than enough funds
> in reserve as of May, 2005 to pay in full the amount owed to Branham under the
> Newland/ Branham contract  (not yet reduced to a judgment).  Finally, failure to follow
> Rule 3020(e) is not Branham's argument to make.  Branham was not a judgment
> creditor of Newland's at the time the plan was confirmed and the first $2.5 million
> distributed.  Its remedies were limited to its attempts to pursue Newland in a non-
> bankruptcy forum.  Its remedies did not include objecting to distribution under a plan in
> which it was not a creditor…

As to the arguments regarding Sections 4.6 and 6.1 of the plan, Branham asserts
that funds to be distributed under the plan were held *in gremio legis* and that "…when
property with a Court held *in gremio legis* is taken and received by others, the recipient
may be held in contempt therefor and caused to return the property to purge their
contempt" (ECF No. 149, p. 6-7 of 18).  This ill-founded argument is another rabbit hole
into which this court will not climb.  Funds distribution occurred and was not in violation
of a court order.  No funds are held "*in gremio legis*".

As of the Confirmation Date, Branham had filed three claims.  Each successive
claim amended the prior claim.  As of the Confirmation Date, the last claim filed was
claim #12 in the amount of $648,200.35.[7]  Claim #12 was in the largest amount of the
three claims filed by Branham as of the Confirmation Date.  As is customary in many
chapter 11 cases, BCU did not object to claims until after confirmation.  Thus, none of
Branham's claims had been objected to or disallowed as of the Confirmation Date.  It
was plausible that Branham's claim #12 could be allowed and that Branham would be
entitled to distribution in that amount under the plan.  In the confirmation hearing,
Branham's counsel contended its claim, as of that point, was about $648,000 and
BCU's counsel represented to the Court that BCU had sufficient funds to pay that claim.
(ECF No. 41-7, pages 10- 13 of 48).  BCU has always maintained that, even after
distribution to creditors under the plan, BCU held in reserve sufficient funds to pay

---

[7] This claim purportedly was Branham's calculation of its success fee owed under the Branham/ Newland
contract.  The State Court later determined that the success fee was $397,853.92 as reflected In the
judgment awarded Branham on November 2, 2007.

Claim #12 until Branham's claims were officially disallowed. The Court made this same finding in its September 17, 2014 order. Branham has not put forth any evidence raising a genuine issue of material fact on this point. The first payment to Newland would not have adversely affected Branham even if its Claim #12 had been allowed because there remained sufficient funds to pay Claim #12. The second installment to Newland was made only after this court disallowed Branham's claims. The Court finds that there is no genuine issue of material fact. It is BCU, and not Branham, that is entitled to judgment as a matter of law and that BCU distributions to Newland did not violate Sections 4.6 and 6.1 of the confirmation order.

### B. Standing

Branham challenges BCU's standing to reopen the chapter 11 case and file its complaint and alleges that BCU has suffered no "injury in fact". It also alleges that because §1141(d) (1)(B) terminated all the equity interests upon confirmation, BCU is a defunct entity. Finally, Branham argues that, under its operating agreement, "final dissolution" occurred when BCU sold its assets and made distribution to BCU's creditors and Newland. (ECF No. 149, p 12-16).

The 001 Case and the 517 Motion implicated distributions made under the plan. Apparently Branham believed that BCU was still a viable entity because it chose to name BCU as a garnishee defendant in the 517 Motion to find out whether it was holding assets owed to Newland and to argue its theories, presented here, that BCU holds pre-petition causes of action that were not distributed and it should claw back "illegal" distributions made pursuant to the confirmed plan.. It is undisputed that BCU has not been dissolved, although the reason for this is not part of the record. If Branham were successful in its state court litigation, distributions under BCU's confirmed plan could have been nullified, recovered and redistributed by Branham, *who was neither a creditor of BCU's nor entitled to distribution under its confirmed plan.* The new contract created by the confirmed plan would have been jeopardized. BCU in fact had "skin in the game" and chose to go back to the court that issued the confirmation order to interpret that and other orders. Branham's challenge to BCU's standing here is

disingenuous and warrants no further discussion.  The court is satisfied that BCU has standing to proceed here.

## IV.  Sanctions

### A.  Contempt

BCU asserts that sanctions are awardable here under (1) this court's contempt powers and (2) this court's "inherent" power to impose sanctions.   Both a bankruptcy court's civil contempt power to enforce its orders and its "inherent" power to impose sanctions for vexatious conduct come under the umbrella of §105(a).  See, *Citizens Gas & Coke Utility v. Mathews*, 2004 WL 2137637 at *8 (S. D. Ind., August 13, 2004); *In re Bailey and Associates, Inc.*, 2005 WL 147055 at *2 (Bankr. C. D. Ill., January 19, 2005) (section 105 codifies the contempt power of bankruptcy courts); *In re Proteva, Inc.*, 271 B.R. 569, 573 (Bankr. N. D. Ill. 2001) (Section 105(a) confers statutory and inherent authority upon the bankruptcy court to impose sanctions):    Section 105(a) provides:

§105.  Power of Court

(a) The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Exercise of the bankruptcy court's contempt powers requires a complaining party to prove by clear and convincing evidence that the contemptuous party has violated the express and unequivocal command of a court order.  *Id.*; *Matter of Rimsat, Ltd.*, 208 B.R. 910, 911 (Bankr. N. D. Ind. 1997).  This Court, in its April 1, 2014 order, found that there were several ambiguities in both BCU's plan and disclosure statement regarding whether BCU's assets were retained by BCU or revested in Newland upon confirmation. Also ambiguous was why the plan made passing reference to BCU reserving the right to "enforce, waive or assign any and all claims and/or causes of action" when none such causes of action were scheduled or specifically referred to by way of exhibit to the plan. The Confirmation Order did not contain any language that resolved these ambiguities and thus was not an "express and unequivocal command" with respect to these matters.

23

BCU also argues that Branham violated the Confirmation Order's discharge and permanent injunction provisions contained in Section 11.2 of the plan that provided upon confirmation that:

> the debtor shall be discharged from any and all obligations and liabilities on account of such Claims. All holders of Claims and Equity Interests, and their successors and assigns, shall be permanently enjoined after the Confirmation Date from asserting against the Debtor, or any of the Debtor's property, any Claims or interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

Branham argues that it did not violate any discharge injunction because BCU was statutorily prohibited from receiving a discharge under §1141(d)(3).[8]   Section 1141(d)(1) provides for discharge upon confirmation of the plan "except as otherwise provided in this subsection, in the plan, or in the order confirming the plan."  If the modifying language "except as otherwise provided in the plan" applies to §1141(d)(3), BCU was free to provide for a discharge in its plan even though statutorily it was not entitled to one.  Even if the modifying language does not apply to §1141(d)(3), the plan provisions prevail even if they are inconsistent with the bankruptcy code.  *In re Sullivan*, 153 B.R. 746, 751 (Bankr. N. D. Tex. 1993) ("[u]nless the confirmation order is successfully appealed, revoked, or otherwise attacked, the provisions of the plan- whether consistent with the Bankruptcy Code or not – bind the debtor"); *Republic Supply v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) ("[r]egardless of whether [a] provision is inconsistent with the bankruptcy laws…it is nonetheless included in the plan, which was confirmed by the bankruptcy court without objection and was not appealed". ).  See also, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (chapter 13 confirmation order remained enforceable and was not remanded to bankruptcy court for correction despite impermissibly providing for discharge of student loan).

BCU's plan provided that its pre-confirmation debts were discharged upon confirmation and Section 11.2 enforced that discharge in that "all holders of Claims and

---

[8] Section 1141(d)(3) provides that confirmation of a plan does not discharge a debtor if (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan and (C) the debtor would be denied a discharge under section 727(a) if the case were a chapter 7 case.  Only individuals are eligible to receive a discharge under §727(a).

Equity Interests, and their successors and assigns" were permanently enjoined from pursuing pre-confirmation claims. Branham asserts that Section 11.2 did not apply to it because, by its own admission, it is neither a creditor of BCU nor an assignee of Newland. (ECF No. 146, p. 24 of 143) ("Branham is not a holder of a Claim….[b]ecause Branham has commenced its pro supp against Newland, *but has not yet received a charging order on Newland's Equity Interest*, Branham is not a holder of an Equity Interest or its successor or assign"). This argument does not help Branham and speaks to the bad faith of Branham in these proceedings. If BCU did receive a discharge, Newland was permanently enjoined from pursuing pre-confirmation claims. Branham as a judgment creditor cannot pursue relief greater than that to which Newland was entitled, even if it had a charging order. Moreover, "a charging order is the only remedy for a judgment creditor against a member's interest in an LLC" *Brant v. Krilich*, 835 N.E. 2d 582, 592 (Ind. Ct. App. 2005); *Crider v. Crider*, 15 N.E. 3d 1042, 1070 (Ind. Ct. App. 2014). As a judgment creditor of Newland, a member of an LLC (BCU), Branham may pursue only Newland's *economic* interest in BCU. In order to do that, it needed a charging order. Whether Branham's conduct in filing the 517 Motion and naming BCU as a garnishee defendant without a charging order was proper should be addressed by the State Court in the 517 Case.

### B. §105

In addition to contempt powers, Section 105 grants broad powers to bankruptcy courts to implement the provisions of the bankruptcy code and to prevent an abuse *of the bankruptcy process. In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997). Prevention of *an abuse of the bankruptcy process* includes the power to sanction litigants who intentionally abuse the bankruptcy judicial process and multiply proceedings in an unreasonable and vexatious manner. *Id*; *In re Rimsat, Ltd.*, 212 F.3d 1039, 1047 (7th Cir. 2000). The party requesting sanctions under §105 bears the burden of proof. [9] *Proteva*, 271 B.R at 574. A finding of bad faith or willful misconduct is needed to prove

---

[9] Courts disagree as to whether the "clear and convincing" or the "preponderance of the evidence" standard of proof applies. See, *In re Varan*, 2014 WL 2881162 at *6 (Bankr. N. D. Ill., June 24, 2014) (opting to apply the clear and convincing standard of proof for the issuance of sanctions under the court's inherent powers granted by §105(a)).

sanctions for abuse of the bankruptcy process whereas a showing of accidental, inadvertent or negligent conduct will suffice for contempt. *Bailey Associates* at *2.

The offending party must have abused *the bankruptcy process* for sanctions to be awarded under this section. Bad faith conduct that unreasonably and vexatiously multiplies the proceedings must occur in bankruptcy court. However, a bankruptcy court may impose sanctions against parties who file vexatious pleadings in state court and who continue to assert such pleadings in bankruptcy court. *Matter of Case*, 937 F.2d 1014, 1023 (5th Cir. 1991). In *Case*, the debtor, an attorney, agreed to execute a $75,000 promissory note to the bank in settlement of its $280,000 claim, all of which was provided for in the plan. During settlement negotiations, the debtor and the bank off-handedly discussed the possibility of the debtor repaying some of the note in kind by providing legal services. Neither the plan nor any representations made in court regarding the plan mentioned this alleged oral agreement. The plan was confirmed, an order deeming the plan "substantially consummated" was entered, and the chapter 11 was closed. The debtor became delinquent on payments due under the note and the bank sued the debtor in state court. The debtor raised the defense that the bank had fraudulently induced him to execute the note by purportedly agreeing to accept his legal services as payment. The debtor also counterclaimed for breach of contract. The bank moved to open the chapter 11 case and moved for a declaratory judgment and sanctions. After a two day trial, the bankruptcy court determined that there was no agreement that the debtor be allowed to pay the note by providing legal services and further found that the debtor had raised the claim only to delay collection of the note. The bankruptcy court sanctioned both Case and his attorney by awarding the bank its attorney fees incurred in both the bankruptcy court and the state court proceeding. For reasons not relevant here, the Fifth Circuit reversed the award against the debtor's attorney for fees incurred in the state court action but affirmed the award against the debtor for fees incurred in both courts and affirmed the award against the debtor's attorney for fees incurred in the bankruptcy court. The court relied on its "inherent power" and on 28 U.S.C. §1927 which provides that "[a]ny attorney ….who so multiplies the proceedings in any case unreasonably or vexatiously may be required by the court to satisfy personally the excess costs incurred because of such conduct."

26

Although Branham's alleged "unreasonable and vexatious" conduct originated in the state court with the 001 and 517 cases, it continues to rely here on the legal theories asserted there. BCU must be found to have undistributed assets if Branham's garnishment action is to have any traction against BCU. The only alleged property to pursue consists of allegations of prepetition causes of action based on nonbankruptcy law. Branham unabashedly continues to beat the "viability of IURC orders" drum and continues to adhere to the "violation of applicable nonbankruptcy business law" mantra even though both- as they related to distributions under and implementation of the plan- were either pre-empted upon confirmation of the plan or were made inapplicable because BCU no longer operated a utility. Branham boldly seeks to hold BCU in contempt for violation of a confirmation order entered in a case in which Branham was not a creditor and under which Branham was entitled to no distribution. Branham makes a specious argument as to BCU's standing, yet named BCU as a garnishee defendant in its own litigation. Branham was a participant in the chapter 11 case, and was given the opportunity to object to pleadings and argue those objections in the bankruptcy court despite its peculiar position that its success fee was based on a contract to which BCU was not a party. In the eight (8) months between the Confirmation Date and the disallowance of its claim in May, 2005, there were sufficient funds to pay Branham's claims. Such conduct was an abuse of the bankruptcy process. The Court will set a hearing in due course for the purpose of assessing sanctions.

Consistent with the findings contained in its April 1, 2014 and September 17, 2014 orders as well as the findings contained herein, the Court declares that:

1.      The bankruptcy court had exclusive jurisdiction over BCU's assets, adjudication of claims, sale proceeds and distributions provided for under the Confirmation Order;

2.      The Sale Order, the Order Disallowing Branham's Claim, the Order Allowing Newland's interest and the Confirmation Order are final and non-appealable orders;

3.      All of BCU's pre-petition property was dealt with under the plan and there were no other additional pre-confirmation BCU assets to pursue or distribute as of the date of distribution to Newland (April 1, 2014 and September 17, 2014 Orders, as well

27

as the discussion in this Order).  The property that BCU did hold after it made distribution to Newland was property subject to distribution as provided for under the Plan and it remained in BCU's hands only until pending claims litigation was resolved. All distributions under the plan were authorized and BCU conveyed good title to all entities receiving property under the plan;

4.      Branham was not and is not a creditor of BCU;

5.      Section 6.1 of the Plan did not require BCU to obtain a separate order directing payment to Newland on account of its equity interest; even if it had, BCU paid a first distribution of $2,500,000 shortly after Plan confirmation and still held sufficient funds to pay Newland the amount of Branham's claim #12 until May, 2005 (April 21, 2013 Order);

6.      The distribution made to Newland shortly after Plan confirmation, while a technical violation of Federal Rule of Bankruptcy Procedure 3020(e), was not a basis in which to hold BCU and Newland in contempt;  Rule 3020(e) is a procedural rule by which the provisions of the Bankruptcy Code are implemented and the Confirmation Order did not expressly direct that BCU wait ten days to distribute funds.   The plan did provide that distribution would be made on the "effective date" of the plan (after expiration of the appeal period) but any misstep in distributing funds earlier were harmless as BCU held sufficient funds to pay Newland the amount of Branham's claim #12 until May, 2005, although Newland was not entitled to them in any case.  Newland accepted payment of the funds before the effective date and before the ten day period provided for in Rule 3020(e) and effectively waived any argument with respect to Rule 3020 (e).  (September 17, 2014 Order).  If Newland cannot raise the Rule 3020(e) argument, its judgment creditor, Branham, cannot either;

7.      BCU, Newland, and its attorneys, agents and employees did not have "unclean hands" as a result of the initial distribution to Newland shortly after the Confirmation Date;

8.      The distributions made to Newland under the confirmed plan were in full and final satisfaction, settlement and release and discharge as against BCU of any and all claims or interests in BCU; Newland has expressly waived any pre confirmation

28

claims against BCU and is permanently enjoined under Section 11.2 of the plan from asserting those claims; (April 1, 2014 Order and September 17, 2014 Orders);

9.      The provisions of the confirmed plan were *res judicata* as to all issues which were decided and which could have been decided before the Confirmation Date, including whether BCU held causes of action against Newland or other persons or entities. (April 1, 2014 and September 17, 2014 orders). Branham had knowledge of the factual allegations underpinning its claims and the claims BCU might have had against Newland or other persons as of the Confirmation Date because they were contained in its proposed complaint attached to its relief from stay motion. Also, Branham was aware no later than the Confirmation Date of the contents of the IURC First Interim Order and the alleged claims BCU had against Newland. (April 1, 2014 Order);

10.     Newland may not pursue or direct BCU to pursue any claims which accrued before confirmation of the plan and receipt of assets from BCU to Newland (September 17, 2014 Order);

11.  Branham's claims filed in the chapter 11 case were disallowed because it was not a creditor of BCU and distribution of funds to Branham after Branham's claim was disallowed would have been in contravention of the order disallowing Branham's claim;

12.     The IURC's First Interim Order became moot upon the closing of the sale to Whitestown on July 20, 2004 and the IURC no longer had jurisdiction over BCU after July 20, 2004 regarding issues related to management, capital structure or operation of the utility. Furthermore, the IURC's "Stand Down" order stayed all proceedings involving BCU that were pending before the IURC, including appeals related to the First and Second IURC Interim Orders, and the IURC has not reversed or vacated that Stand Down Order;

13.     Section 6.2 of the Plan generally provided that, to the extent non-bankruptcy law governed approval or authorization regarding transfer of the utility, transfer or assignment of BCU's property or issuance of permits, it was preempted by the plan and §1123(a) of the bankruptcy code. That section also provided that any law, regulation or rule that might otherwise apply to the sale of BCU's assets and

29

implementation of its plan were also preempted.  Compliance with IURC and Indiana LLC law with respect to distributions and redemptions interfered with the implementation of the plan and thus were preempted by the express terms of the confirmed plan, and was permissible under §1123(a);

14.   Newland, as sole member of BCU, may pursue any claims held by BCU that arose post confirmation, (September 17, 2014 order);

15.   Nothing in the Confirmation Order or Plan prohibits Branham from pursuing or conducting discovery regarding Newland's interest in BCU's assets acquired post confirmation (September 17, 2014 Order);

16.   The allegations contained in the 001 and 517 cases in State Court directly implicated the very essence of the confirmed plan-distribution to professionals, creditors and interest holders-and BCU has standing to seek interpretation of this court's orders entered in its chapter 11 case and to seek any relief related thereto;

17.   The Court **does not and will not** make any declaratory judgment as to the remaining matters upon which BCU asks for declaratory judgment, including, but not limited to the following:

(a)   The extent of BCU's involvement in the 517 case, and the effect of Branham's withdrawal of the 517 case;

(b)   The extent to which BCU must comply with applicable non-bankruptcy law regarding assets that accrued post confirmation, as well as post confirmation administration and dissolution of BCU as an LLC;

( c )   Whether Branham was barred from bringing the 517 and 001 Cases by the doctrines of laches, statute of limitations, waiver and estoppel;

(d)   whether statements made by attorneys Bator and Eckerle in the January 19, 2005 teleconference created any state law claims in favor of Branham;

(e)   whether such distributions by BCU's agents and professionals – having been found to be proper-- constituted criminal predicate acts under Indiana law; and

(f)   whether Branham, its principals and attorneys, intentionally misled or otherwise withheld from the State Court in the 001 and 517 cases certain events that had occurred in BCU's bankruptcy case and orders that had been entered.

IT IS FURTHER ORDERED THAT:

1.      Branham's motion for summary judgment is denied in all respects;

2.      BCU's motion for partial summary judgment is granted, consistent with the declarations set forth above;

3.      The court will set a hearing to determine sanctions and will notify the parties in due course. Final judgment will be entered in this matter upon determination of sanctions against Branham for its vexatious litigation as identified above in this Order.

**# # #**